Lynn v. McCue.

Nos. 19,148 and 19,149.

THOMAS LYNN, *Appellee,* v. B. M. McCUE et al., *Appellees,* and THE COMMONWEALTH TRUST COMPANY et al., *Appellants.*

SYLLABUS BY THE COURT.

1. JUDGMENT—*When Not an Adjudication of Matters Occurring after Action Begun.* In an action to foreclose a first mortgage one who was made a party after summons had been served on the mortgagor filed an answer setting out a second mortgage. The mortgagor made no appearance. The decree provided that after the satisfaction of the first lien the residue of the proceeds of sale should be applied to the second mortgage; it recited that the mortgagor was indebted to the second mortgagee in a stated amount, but included no personal judgment against him. *Held,* that the judgment was not an adjudication against the mortgagor with respect to a defense to the balance of the debt, which originated after the second mortgagee was made a party, but before the judgment.

2. ADJUDICATION—*Findings Constitute because Affecting Judgment.* A corporation to whom as trustee a mortgage was executed, securing railroad bonds, brought an action to foreclose it. The corporation held a number of the bonds in its individual capacity as security for the note of their owner, who set up a claim that by a pretended sale the pledgee had converted them, thus reducing or satisfying the debt to secure which they were pledged. The court made a finding that there had been no sale and no conversion; that the corporation still held the bonds as security, having a lien on them for the amount due on the notes, which was stated. A judgment was rendered that the property should be sold, that the debt due the corporation should be paid out of the proceeds, and that the residue should go to the owner of the bonds. *Held,* that the findings were confirmed and given effect by the judgment, and the question of conversion was adjudicated.

3. SAME—*Appointment of Receiver for Corporation— No Service on Corporation—Appointment a Nullity.* Under a statute authorizing the state to bring an action for the dissolution of an insolvent corporation, and to have a receiver appointed at the time the petition is filed, a petition was filed and an order was made appointing a receiver, who qualified as such. A summons was issued and served on the defendant corpora-

tion, but was quashed on its motion. No other service was ever attempted and nothing further was done in the proceeding. *Held*, that the appointment of the receiver is to be regarded as a nullity.

4. SAME—*Such Receiver Can Not Bind Corporation by Appearance in Action*. Where a person acting under color of an appointment as receiver, under the circumstances above stated, appears in an action to which the corporation is a party and participates with it in a defense to a claim made against it, a judgment against the corporation and the person so acting as receiver does not constitute an adjudication with respect to a receiver of the corporation duly appointed before it was made a party to such action.

5. BORROWING MONEY—*Real Lender—Usury*. Proof that one to whom an application for a loan was made considered lending the money, but finally refused to do so on the ground that the highest lawful rate of interest was not sufficient compensation in view of the risk, and then received a commission from the borrower for procuring a bank to make the loan at that rate, agreeing to take it up himself on demand, and shortly afterwards doing so, is not conclusive evidence that he was the real lender, and that the transaction was usurious.

6. PLEDGE OF COLLATERALS—*Sale—No Notice to Pledgor—Bid in by Pledgee—Bad Faith—Conversion*. Where the pledgee of collaterals under a contract authorizing him to bid at his own sale advertises to sell them, without notice to the pledgor, intending not to have them bring the largest price available, but to retain a secret lien on them, and causes them to be bid in by a third person acting solely in his interest, and afterwards professes not to know whom the bidder represented, such want of good faith is shown as to characterize the transaction as a conversion.

7. SAME—*Pledgee Estopped to Deny Conversion*. Under the circumstances stated, the pledgee having professed that the collaterals had been sold to a stranger, can not defeat a charge of conversion by showing that at all times he had actual control of the property.

8. SAME—*No Tender of Payment by Pledgor Required*. Where the pledgee of collaterals makes a sale of them which is invalid because not made fairly and in good faith, the pledgor need not tender the payment of his debt in order to maintain a charge of conversion.

Appeals from Haskell district court; GEORGE J. DOWNER, judge. Opinion filed April 10, 1915. Modified.

*Lee Monroe,* of Topeka, and *W. S. Roark,* of Junction City, for appellant The Commonwealth Trust Company.

*William Easton Hutchison,* and *C. E. Vance,* both of Garden City, for appellee Thomas Lynn.

*F. Dumont Smith,* of Hutchinson, *Richard J. Hopkins, R. W. Hoskinson,* and *Albert Hoskinson,* all of Garden City, for appellees B. M. McCue *et al.*

The opinion of the court was delivered by

MASON, J.: Two actions are involved, but as they have been heard together both here and in the district court, and as they are in all respects similar, only one of them will be discussed.

Thomas Lynn sued in Haskell county to foreclose a real-estate mortgage given by B. M. McCue. The plaintiff obtained a judgment, which is not challenged. The Commonwealth Trust Company, a Missouri corporation having offices in St. Louis, which will hereinafter be referred to as the trust company, asserted a claim under a second mortgage, and the vital controversy is between that corporation on the one hand, and McCue and the receiver of the Kansas Construction & Irrigation Company (which will be called the construction company) on the other. John Rice and the New England National Bank are judgment creditors of McCue, subsequent in time to the mortgages. Their interest lies in the defeat of the trust company's claim by McCue. McCue's contention is that the mortgage to the trust company was given as security for an indebtedness of the construction company, and he and the receiver of the construction company maintain that the indebtedness was subject to deduction on account of usury, and to a counterclaim of damages for the conversion of collateral held by the trust company as security. The trust company contends that the claims of usury and conversion have been adjudicated and denied in earlier litigation. The trial court held that there had been no former adjudication, that no usury had been exacted,

and in one sense at least that the trust company had not been guilty of conversion. It decided, however, that the sale of securities, on which the charge of conversion was based, was so conducted as to entitle the debtors to a credit of $595,000, instead of what the trust company allowed—$195,000. The trust company appeals from the judgment rendered, by reason of the allowance of this $400,000 additional credit; McCue and the receiver of the construction company appeal by reason of the disallowance of the claims of usury and conversion.

Detailed findings were made, and the facts found will be spoken of as established. The Scott City Northern Railroad Company was incorporated August 3, 1910. It made a contract with the construction company to build a line of railroad from Scott City to Winona, for which the construction company was to receive all the aid notes and bonds of the railroad company, all its stock that was not issued to municipalities, and its first-mortgage bonds to the amount of $825,000, the mortgage running to the trust company as trustee. Under this contract the construction company received 4993 shares of the stock of the railroad company, aid notes and bonds amounting to $167,160, and the trustee held for its benefit $825,000 of the railroad company's mortgage bonds. The construction company applied to the trust company for a loan of $400,000. The trust company refused to make the loan itself, but for a commission of $60,000 procured it to be made by The National Bank of Commerce of St. Louis, agreeing with the bank to find a purchaser for the note on demand, at the amount of principal and accrued interest. The stock, aid notes and bonds, and railroad mortgage bonds already mentioned, were pledged as security for this $400,000 note, which was dated September 1, 1910, due in one year, bore interest at six per cent, and was signed by the construction company and also by McCue and E. A. Tennis, who were respectively its president and

secretary.   On October 20, 1910, the trust company bought the note from the bank. . Between October 20, 1910, and July 1, 1911, the construction company borrowed from the trust company $190,000 upon its four notes drawing eight per cent interest.   The same collateral was pledged as security for these notes.

About July 13, 1911, the five. original notes were surrendered, and in lieu of them, and also to cover an additional loan of $10,000, new notes, made payable to the bank, dated June 1, 1911, and due September 1, 1911, were executed as follows:

One note for $400,000, bearing six per cent interest, signed by McCue and Tennis, secured by a note for a like amount executed by the construction company to McCue and Tennis, which in turn was secured by the same collateral securing the original $400,000 note. McCue and his wife also gave as additional security to the note to the bank several real-estate mortgages, including the one sought by the trust company to be foreclosed in this action, and another upon lands in Anderson county.

Two notes for $100,000 each, signed by the construction company, and secured by the same collateral already referred to—the 4993 shares of stock in the railroad company, the aid notes and bonds, and the $825,-000 railroad mortgage bonds, which also secured the $400,000 note from the construction company to McCue and Tennis, which secured the $400,000 note from McCue and Tennis to the bank.

The trust company, as before, agreed to find a buyer for these notes on demand of the bank, and took up two of them in July, 1911, and the third in February, 1912. In all of these transactions the construction company was the real principal, and McCue and Tennis the sureties.   The railroad was built at an expense of something over $180,000 in addition to the loans. for $600,-000.  The contract by which the stock, notes and bonds were pledged as collateral provided that they might be

sold at public or private sale upon such notice as the holder might deem proper, and that the holder might become the purchaser at the sale.

On January 3, 1913, the trust company published a notice in the *Times,* a daily St. Louis newspaper, that it would on the 13th of that month sell the stocks, aid notes and bonds already described, for the purpose of satisfying the two notes for $100,000 each. On that date the property was offered for sale and bid in by Charles Campbell, an employee of the trust company, acting in its behalf, for $195,000. No notice of the sale was given to McCue, Tennis, or the construction company, and none of them knew anything of it. Campbell at once assigned the securities to the Germania Trust Company, a corporation which was practically out of business, and which was controlled by the (Commonwealth) trust company. On the same day two of the railroad bonds were assigned to each of two employees of the trust company, and they, with the Germania company, signed a writing requesting the trust company to foreclose the mortgage at once. All the securities were afterwards assigned to the trust company.

The president of the trust company testified, in substance, that he believed the buyer under such a notice would take title to the property subject to the trust company's lien upon it as security for the $400,000 note. Doubtless by reason of this testimony, and of the facts already stated, the trial court held that the sale was made subject to that lien, and gave the transaction the effect of a sale for $595,000. The statement so far made shows the basis of the claims made as to usury and conversion. McCue and the receiver of the construction company contend that the commission charged by the trust company for negotiating the $400,000 loan was in reality interest, and that the sale of the collateral was not conducted in good faith, and amounted to a conversion. What follows relates chiefly to the

issue of former adjudication, although perhaps throwing some light upon the other questions.

In an action brought by the trust company in Logan county on January 27, 1913, a judgment was rendered foreclosing the railroad mortgage, upon which the railroad property was sold for $175,000 to the Colorado, Kansas & Oklahoma Railroad Company, a corporation owned or controlled by the trust company. McCue was made a party to this action, but filed no pleading. The trust company was made a party individually as well as in its capacity as trustee. The construction company filed an answer, raising the questions of usury and conversion substantially as those matters are presented in this case. The construction company (with other defendants) demanded a jury trial. The court announced that on account of the absence of W. M. Kinnison, who had been appointed receiver of the construction company, it would not determine anything as to the rights of that company, but would hear such issues as were not triable by jury. Evidence was then taken and the court made findings with regard to the deposit of collateral for the security of the loans and the sale of the stock, notes and bonds so pledged, substantially as the facts have already been stated. Inferentially at least the court found against the claim of usury, for specific findings were made as to the amounts due on each of the three notes, the one for $400,000 and the two for $100,000 each, and that the contracts of pledge were valid. The court also stated in writing a number of conclusions of law, among which were that the purported sale of collateral was a nullity, that no conversion resulted, and that the trust company was still the holder of the stocks, notes and bonds as security for the balance due on the notes held by it, the construction company being the owner subject to that lien. The judgment recited that an immediate sale of the property had been petitioned for in accordance with the statute by a majority in amount of the holders of the

bonds—a step required by the statute if a sale is to be made within three years. (Gen. Stat. 1909, §§ 7022, 7023.)

On January 17, 1913 (all the dates in this paragraph being in the same year), a petition was filed in the district court of Logan county, in the name of the state, asking the dissolution of the construction company, and an order was made appointing W. H. Wagner its receiver, in accordance with the statute. (Gen. Stat. 1909, § 1728.) A summons for the company was issued to the sheriff of Finney county, by whom it was served on McCue, its president. The company on February 19 filed a motion to quash the service on the ground that the action was transitory, and not local, which was sustained on May 27. No further proceedings were ever had in the case. W. M. Kinnison was appointed receiver of the construction company by the district court of Finney county, on March 29, in an action brought by a creditor. Neither McCue, the construction company, nor Wagner were originally made parties to the action brought to foreclose the railroad mortgage. On March 7 McCue filed a motion asking that they, and the trust company in its individual capacity, and others named, be made defendants. On March 18 the court ordered that Wagner, as receiver, enter an appearance immediately; that the trust company individually should do the same, or if it did not, that the plaintiff should make it a party; and that McCue and the construction company (with others) were granted leave to file such intervening petitions or interpleas as they might desire on or before April 1. Wagner, as receiver, filed a general denial on March 31, and an amended answer alleging usury and conversion on May 27. The construction company filed an answer alleging usury and conversion on April 2.

The trust company contends that the proceedings of the Logan county district court just narrated constitute an adjudication that no usury was exacted, and that

there was no conversion of the securities.    It makes another claim of former adjudication based upon a judgment of the district court of Anderson county. In September, 1912, an action was brought in that county by the holder of a first mortgage on lands on which McCue had given a second mortgage to secure the $400,000 note held by the trust company.    The trust company was made a defendant, and filed an answer asserting a lien of $400,000 against the land and asking that the proceeds of the sale be applied to it.    McCue was served with summons, but made no appearance except by a motion after judgment to set it aside, which was overruled.    The decree recited that McCue was indebted to the trust company for $400,000 and interest, but no personal judgment against him was rendered or asked.

The rule that a judgment settles not only the matters actually litigated, but also those that might have been litigated, applies only where the same cause of action is sued on.    (*Stroup v. Pepper,* 69 Kan. 241, 76 Pac. 825; 23 Cyc. 1295-1297.)    The trust company did not—in the sense which is here important—sue McCue in Anderson county upon the $400,000 note.    It sued him upon the mortgage.    It merely sought to have the proceeds of the sale of the Allen county land—or any surplus after the payment of the first mortgage—paid to it to apply on that note.    In the present action the trust company declared upon its mortgage on the Haskell county land.    McCue and the receiver of the construction company raised the issue as to what was owing on the $400,000 note by pleading, in effect, that it had been fully paid.    That issue was not in fact contested in the Anderson county suit.    A finding is an adjudication only as it is given effect in a judgment.    (23 Cyc. 1227.)    The recital in the journal entry of the amount due hardly seems to have entered into the substance of the judgment, which was that the residue of the proceeds of the sale, after satisfying prior liens, should be

49—94 Kan.

applied to the trust company's mortgage. Until there had been some kind of an accounting, that was a proper disposition of it. The matter is determined, however, by another consideration. Neither the bank nor the trust company were originally parties to the action. Three amended petitions were filed, in the last of· which, filed January 7, 1913, they were made parties. McCue was served with a copy of the first, but not of the other two. The rule that a defendant who is served with summons must take notice of all subsequent proceedings is not of universal application. (*Beekman v. Trower*, 82 Kan. 327, 108 Pac. 110.) The answer of the trust company was filed January 14, 1913 (the day after the purported sale of the collateral). It would have taken a supplemental pleading on the part of McCue to raise the issue of conversion. As to that issue the judgment, on any theory, was a correct declaration of the facts as they stood when the action was begun, when McCue was served, and when the trust company was made a party. In the absence of some special reason to the contrary, the pleadings are deemed to speak as of the time of the commencement of the action. (*Brown v. Galena Mining and Smelting Co.*, 32 Kan. 528, 4 Pac. 1013.) The Anderson county judgment, therefore, was at the most an adjudication of matters as they existed when the trust company was made a party, January 7, 1913, and did not conclude McCue as to the conversion.

The action brought by the trust company in Logan county was originally one merely for the foreclosure of the mortgage on the railroad property for the benefit of the owners of the bonds, whoever they might be. The plaintiff as trustee had authority to bring it,· and the question of who owned the bonds was important only because a sale within three years could not be made without the consent of a majority of them. The construction company was made a party on motion of McCue, and raised the question of usury and conver-

sion.  The findings on these matters could not constitute an adjudication against the construction company except as they induced and entered into a judgment. The judgment of foreclosure and immediate sale did not give these findings the effect of an adjudication, because that judgment was not influenced by them.  To render such judgment it was necessary for the court to find that the trust company in its individual capacity was the holder of a majority in amount of the bonds.  The court held the trust company individually to be the holder of the bonds in virtue of their being put up as collateral security for the notes it owned.  It would equally have been their owner if their sale had been valid, or if it had been guilty of their conversion, for in the latter case the title would be deemed to have passed to the trust company, leaving it liable in damages to their pledgor.  But the judgment did not stop there.  The court not only ordered the sale of the railroad property, it provided, as it obviously had jurisdiction to do, for the distribution of the proceeds of the sale.  Instead of providing for their payment to the trust company as trustee, for the benefit of the owners of the bonds, the decree provided that (after some minor obligations were satisfied) they should be devoted first to paying the trust company the amount found due on its notes, and that the residue be paid into court for the benefit of the construction company, or Wagner, its receiver.  Therefore the court not only found, but adjudged, that the construction company was the owner of the bonds, subject to a lien of the trust company (in its individual capacity) for the sum due on the three notes (for $400,000, $100,000 and $100,000), that no usury had been charged, and that no conversion had taken place.  This judgment is conclusive upon McCue and the construction company.

A more difficult question is whether the judgment also concludes Kinnison, as receiver of the construction company.  He was appointed March 29, 1913.  The

construction company did not become a party to the foreclosure action until it filed a pleading, or until April 2, 1913. After the appointment of Kinnison as receiver no act of the company could operate to the prejudice of the creditors whose interests he represents, and he would not be bound by a judgment rendered against the corporation in an action to which he was not a party, begun during his receivership. The doubt in the matter arises from the anomalous attitude of Wagner. An order of the court named him as receiver of the construction company on January 17, 1913, on the filing of a petition against the corporation, the statute authorizing an appointment at that time. A summons was issued which was afterwards quashed, and the proceedings were then abandoned. If a subsequent service had been made, no doubt the appointment would have been good from the first, but as nothing further was ever done in the case the receiver was left without any action having been begun, and the appointment must be regarded as a nullity from the beginning. It is argued that Wagner was at least a receiver *de facto*, and that as he actually engaged in the litigation in that capacity another receiver ought not to be permitted to relitigate the same issues. The presence of Wagner, however, did not affect the conduct or result of the case. He merely made the same contentions as receiver which the construction company made for itself. And before the trial was begun the court recognized the existence of the other receiver and announced, in substance, that the issues in which he had an interest would not be tried in his absence, showing a purpose that his rights should not be affected by what was done in a case to which he was not a party. We conclude that Kinnison as receiver is not estopped by what was done in the Logan county district court.

The question of usury appears to be purely one of fact. In form the original transaction between the construction company, the bank and the trust com-

Lynn v. McCue.

pany was this: The construction company applied to the trust company for a loan of $400,000. The trust company at first considered making it, but finally re-refused to do so on the ground that the highest lawful rate of interest was not sufficient compensation in view of the risk involved. Then the trust company offered to procure the loan from the bank for a commission of $60,000, and the offer was accepted and carried out. To induce the bank to make the loan the trust company agreed to take it up at any time on demand of the bank, and within a short time did so. If the deal was just what it purported to be it was legitimate, the $60,000 was paid as a commission and not as interest, and did not constitute usury. (39 Cyc. 978, 980.) But if the various steps taken were a mere cover—if the trust company was the agent of the bank, or if the trust company really loaned its own money to the construction company through the bank, or borrowed the money itself from the bank and loaned it to the construction company—then the transaction was usurious. (39 Cyc. 922, 971.) There was much in the circumstances attending the affair, and in the correspondence of the parties, tending strongly to show that the bank was a mere figurehead in the matter. But this can not be said to have been conclusively proved. There was some oral testimony to the contrary, and the decision of the trial court against the claim of usury must be regarded as settling the matter.

The finding made by the trial court that the sale was valid and that there was no conversion was essentially (in view of the more specific and detailed findings) a conclusion of law, and is subject to review. The court did not find that the sale was valid, regarded as one made for $195,000, the amount of the bid, but that it was to be deemed a sale for $595,000, a view sustained by this reasoning: The transaction was completely controlled by the trust company. It was both seller and buyer. In each capacity it understood that the sale

was for $195,000, subject to a lien of $400,000. Therefore, the sale must be deemed to have been made for $595,000, that being the amount the company as both buyer and seller had determined on as the selling price. No doubt this theory reaches a close approximation to a just result, but we find ourselves unable to accept it in the present situation, and must decide whether the receiver of the construction company has a claim against the trust company for conversion.

We think the sale was obviously made in violation of the trust company's duty to McCue and the construction company, and therefore amounted to a conversion, not because the pledgee was the buyer, but because it was not made fairly and in good faith. The contract of pledge authorized the trust company to become a bidder, and such agreements are upheld. (*Chouteau v. Allen*, 70 Mo. 290; Jones on Collateral Securities, §635.) But the circumstance that the pledgee bought at its own sale doubtless justifies an especially close scrutiny of the transaction, and at all events the utmost good faith must be shown. (31 Cyc. 879.) The trial court found that the purpose of the trust company was not to sell the collateral to the highest bidder, or for the largest amount available, but that it had a secret intention to retain a lien upon it for $400,000. The evidence sustains the finding, and justifies the inference of a purpose to gain title to the securities without making a fair and reasonable credit upon the principal debt. The trust company was under no positive obligation to notify McCue or the construction company of the sale, but its omission to do so is a circumstance to be weighed with others in determining whether concealment was intended. That the trust company, being itself the real buyer, saw fit to take the title in some one else, might not of itself have any special significance. Considerations of convenience might have suggested that method of doing the business. But elaborate steps were taken (the details of which need not be gone into) to

give the affair the appearance of an actual deal with a stranger, and the president óf the trust company, who was active in the management of the transaction, in a deposition taken afterwards, testified that he did not know for whom Campbell was acting in buying in the property. This deception and concealment is fairly to be regarded as a part of the original plan, and is sufficient in view of all the circumstances to characterize the whole transaction as conducted in bad faith, in fraud of the rights of the pledgors, and as constituting a conversion. (*Boam v. Cohen*, ante, pp. 42, 46, 145 Pac.· 559; Note, 43 L. R. A. 737; Note, 53 L. R. A. 865.) It is sometimes said that conversion only results when the pledgee has lost control of the property pledged, so that he can not restore it to the pledgor. (See note last cited.) That is doubtless true in many situations. But although the trust company at all times had actual dominion over the collateral, it can not (after having professed the contrary and after conditions have perhaps changed) avail itself of that fact to relieve itself of any of the consequences of its breach of faith. Nor is it necessary, in such circumstances as are here presented, for a pledgor to tender the amount of his debt in order to assert a claim for conversion. (31 Cyc. 844, 845, 881; 22 A. &·E. Encycl. of L. 874; Note, 43 L. R. A. 759.)

Various remedies might be open for the wrong done, but under the peculiar complications that have arisen in this case, the receiver being the only party who is in a position to complain, the only remedy available seems to be the recovery, for the benefit of the creditors of the construction company, of damages measured by the loss occasioned to that company by the conversion in excess of its indebtedness on the notes. Should such amount exceed the legitimate claims of · creditors, the surplus would of course not go to the construction company or its stockholders, but back to the trust company.

The trust company contends, and has consistently contended at all times, that the district court had no

jurisdiction to entertain the claim of the receiver of the construction company. The trust company came into court to assert its lien against McCue's land under the mortgage given as additional security for the $400,000 note executed by McCue. What amount, if anything, was due on that note depended upon the validity of the sale of the collaterals pledged for its payment (or pledged for the payment of the note for $400,000 signed by the construction company, which nominally was pledged to the payment of the McCue note, but which the court found to be in fact the principal obligation). The full determination of that question could not be had without the presence of the construction company and of its receiver. The issues were properly made up for the settlement of the entire controversy. The decision that McCue and the construction company are estopped by the Logan county judgment does not deprive the court of jurisdiction to try the issues between the receiver and the trust company.

The judgment creditors of McCue (Rice and the New England National Bank of Kansas City) have liens only on the interest of McCue, and their claims are subordinate to that of the trust company.

The findings of fact made by the trial court, except so far as they state the legal effect of the sale of the securities, are approved. The judgment is affirmed as to the plaintiff; otherwise it is set aside, with directions to grant to the trust company the relief asked against McCue and to award to the receiver (for the benefit of the creditors) damages against the trust company in such sum as that company shall be found to have suffered from the conversion referred to. The plaintiff and the receiver will have judgment against the trust company for their costs on the appeal. The trust company will have judgment against McCue for one-half its costs. Otherwise the parties will pay their own costs.

DAWSON, J., not sitting.