No. 21,780.

THOMAS F. MARSHALL, *Appellee*, v. C. W. BEELER, *Appellant.*

### SYLLABUS BY THE COURT.

USURY—*Common-law Right to Recover Back Usurious Interest Abrogated by Kansas Statute.* The provisions of the statute regulating the legal rate of interest and providing penalties and forfeitures for taking or contracting for the payment of interest in excess of the statutory rate (Gen. Stat. 1915, §§ 5482, 5483) have abrogated the borrower's common-law right to recover back usurious interest.

Appeal from Edwards district court; ALBERT S. FOULKS, judge. Opinion filed January 11, 1919. Reversed.

*W. E. Broadie,* of Kinsley, *F. V. Russell,* and *R. C. Russell,* both of Great Bend, for the appellant.

*Elrick C. Cole, William Osmond,* both of Great Bend, and *A. L. Moffat,* of Kinsley, for the appellee.

The opinion of the court was delivered by

PORTER, J.: The action was for the recovery of usurious interest. Plaintiff owned a large tract of land in Edwards county upon which defendant held mortgages securing notes past due, to the amount of $97,500. They entered into negotiations for an extension of the loan, and it was agreed that plaintiff should execute renewal notes and mortgages for $100,-000, bearing interest at 10 per cent; $2,500 of the amount to constitute a bonus to defendant for extending the loan. This agreement was carried out, and subsequently plaintiff paid the loan with interest in full, the last installment being paid October 14, 1916.

The petition, which was filed December 6, 1916, set up a cause of action for money had and received from plaintiff

Marshall v. Beeler.

without consideration. A demurrer to the petition was overruled, and defendant answered, admitting that the amount plaintiff owed was less than the face of the notes and mortgages, but alleging that plaintiff offered to pay the additional sum in order to obtain the privilege of separately paying the several notes and mortgages and obtaining releases of the mortgage liens on portions of the lands, and as a consideration for the renewal of the loan. It alleged that plaintiff was greatly benefited by the arrangement; that prior to the renewal he was unable to pay the indebtedness, and unable to sell such a large tract of land to any one person, or to sell any portion of the land without paying the entire debt, which he was not able to do; that by dividing the loan and the time of payment, the defendant suffered the inconvenience and expense of recording several different mortgages, instead of one, and the possible expense and trouble of having to begin a number of foreclosures in order to collect the amount; and that the entire $100,000 and interest thereon was freely and voluntarily paid by the plaintiff without objection or protest.

To this answer the plaintiff filed a demurrer, which the court sustained. The defendant elected to stand upon the answer, and judgment was thereupon rendered against him for the sum of $3,465.72, from which he appeals.

The main question for determination is whether a borrower of money has, in this state, the common-law right of action to recover back usurious interest which he has voluntarily paid.

The defendant makes the preliminary contention that the bonus or commission collected from the plaintiff was not, in fact, usurious, and insists that the case of *Lynn v. McCue*, 94 Kan. 761, 147 Pac. 808, decides that where a bonus is charged as a commission for making a loan, the transaction is not usurious. The point decided was the reverse of what the defendant contends. The case was one where three parties were concerned in the transaction, a bank, a trust company, and the borrower. There was a conflict in the testimony as to whether the trust company was merely the agent of the bank, or really loaned its own money. It was said in the opinion:

"But if the various steps taken were a mere cover—if the trust company was the agent of the bank, or if the trust company really

loaned its own money . . . then the transaction was usurious." (p. 773.)

The facts admitted by the answer in the present case show that the lender took the excess, and that the transaction was usurious. (*Jenness v. Cutler*, 12 Kan. 500, 513.)

The defendant contends that the principle of law that a party to an illegal contract will not be permitted to come into a court of law or equity and ask to have his illegal objects carried out, applies, because the borrower who pays excessive interest violates the law and is *in pari delicto* with the lender; and that before the plaintiff can state his case, he must necessarily disclose that the contract to which he was a party had an illegal purpose, and therefore the courts will leave both himself and the defendant in the situation in which they find themselves.

The question whether one who has paid excessive interest may recover the excess in an action for money had and received, has never been before this court. It is one upon which great contrariety of opinion has prevailed among the American courts. Some of the apparent conflict can readily be accounted for by differences in the statutes of usury; some of the real conflict can only be explained by the different views adopted by the courts as to the effect of the statutory provisions. It is remarkable, however, that very many of the earlier, and some of the modern, decisions support the contention urged by the defendant in the present case, and deny the right to recover the excess, upon the ground that the parties are *in pari delicto;* some of them making use of this doctrine of the law as a basis for declaring the payments to have been voluntary. Before considering the decisions which turn upon differences in the statutes of usury, we shall attempt to demonstrate that the theory that the parties are in equal wrong, although supported by numerous decisions, is opposed not only to sound reason, but also to the weight of authority.

From the earliest times the term "usury" was synonymous with the term "interest," and meant the taking of any compensation whatever for the use of money. For long centuries men who loaned money on interest were considered as felons of the law. By the laws of Moses, the Jews were prohibited from taking interest from one of their own race, but were permitted

Marshall v. Beeler.

to exact interest from a stranger. The Jew made the most of the exception, and his race became the bankers of the world. With the persistence of his race, the Jew continued to follow the trade of lending money, driven from one country to another, despised, persecuted, and despoiled, and found in the requirements of needy merchants and impecunious princes opportunities for carrying on his business.

"Anciently it was holden to be absolutely unlawful for a Christian to take any kind of usury, and that whoever was guilty of it was liable to be punished by the censures of the church in his life time; and that if after death anyone was found to have been a usurer while living, all his chattels were forfeited to the king, and his lands escheated to the lord of the fee." (10 Bacon's Abrid. Title, "Usury.")

In the twelfth century it was decreed in one of the councils of the church that impenitent money lenders should be excluded from absolution in the hour of death, and from Christian burial. In the same century ordinances of the church were leveled against the Jews, which despoiled them of their goods, drove them from the country, and freed their debtors. The Protestants were as bitter against usury as the Church of Rome. Martin Luther declared that every usurer was a thief and worthy of the gibbet.

Under Henry VII a law was passed which made the taking of any interest a criminal offense. It imposed a fine of one hundred pounds, besides the annulment of the loan, and in addition, the statute provided that after the civil courts were through with the offenders, the church should still have jurisdiction, and reserved to the church, notwithstanding this punishment, "the correction of their souls according to the laws of the same." In those countries which came under the influence of the Anglo-Saxon mind we find the first distinction between usury and reasonable interest.

The "Bill of Usury" of Edward VI was enacted in 1552; a fragment of it reads as follows:

"Forasmuch as usury is by the word of God utterly prohibited as a vice most odious and detestable, as in divers places of the Holy Scriptures, it is evident to be seen, which thing by no Godly teachings and persuasions can sink into the hearts of divers greedy, uncharitable and covetous persons of this realm, nor yet, by any terrible threatenings of God's wrath and vengeance, etc.," it is enacted, that "whosoever shall thereafter lend money for any manner of usury, increase, lucre, gain, or

interest, to be had, received or hoped for, shall forfeit principal and interest and suffer imprisonment and fine at the king's pleasure."

In Protestant Holland sound reason gained some headway against the absurd prejudice, and the great law writer, Hugo Grotius, rendered able assistance to the cause of science and truth by his reasoning upon the subject. At a time when bankers were excluded from the communion table in the Dutch Church, Grotius, in his celebrated work, *De Jure Belli et Pacis,* (which the late Ambassador White said, "has wrought more benefit to humanity than any other attributed to human authorship,") declared the prohibition of interest to be Scriptural, but combated the doctrine of Aristotle, and favored the allowance of interest on practical grounds. (Lib. 2, Cap. XII, par. 20, cited in note to "Theology and Political Economy" by Andrew D. White, *Pop. Sc. Monthly,* vol. 40, 323, 333.)

One of the early Protestant leaders to recognize the distinction between usury and reasonably interest was John Calvin. Jeremy Bentham, too, in his "Defense of Usury," Letter X, argued the matter upon common-sense principles, and took a decided stand against the old doctrines. Gradually bigotry and superstition began to give way to the requirements of trade and business. The conflict between the necessities of business and trade on the one hand, and superstition and prejudice on the other, had been evident for centuries.

One of the most interesting curiosities of the history of this struggle is, that at a period as early as the 15th century, some of the Fathers of the Church, realizing that the struggling commerce of the times, as well as the natural laws of trade, demanded the extension of the credit system, and the employment of capital, and that interest was gradually becoming a virtual necessity, advanced the peculiar doctrine that Jews might be allowed to take interest, since they were to be damned in any case, and by giving them a monopoly of the business, the souls of Christians might not be lost. (*Liegois, Histoire de l'Usure,* p. 82.)

The doctrine announced by Calvin, that the true meaning of usury was illegal or oppressive interest, began to be accepted in England and in most Protestant countries during the reign of Elizabeth.

Marshall v. Beeler.

In his article published in the *Popular Science Monthly,* to which we have already referred, Mr. White points out that it was not until late in the 19th century that social science as applied to political economy, gained a victory final and complete in respect to interest; and that as late as 1873, there "appeared a book published under authority from the Holy See, allowing the faithful to take moderate interest under condition that any future decisions of the Pope should be implicitly obeyed."

It is worthy of note that from the time when no distinction was recognized between usury and interest, the ecclesiastical law, and later, the statutes and the common law of England, paid no attention whatever to the attitude of the borrower. He was not regarded as a *delict*, or *particeps criminis*. It was against the greed and oppression of the lender alone that the church leveled its decrees. He alone of the parties to the transaction was excluded from the altar, denied absolution in the hour of death, and a Christian burial after death. Neither in the statute of Edward VI (1552), which forfeited the principal and interest and authorized the fine and imprisonment of the lender, nor in any subsequent English statute against usury, will there be found language reflecting upon the conduct of the borrower, or imposing penalties upon him.

In this connection the history of our own statute has peculiar significance. The first interest statute in Kansas was adopted by the territorial legislature of 1860 and made interest in excess of 20 per cent, by contract, usurious. The statute contained also the express declaration, "nor shall any debtor be deemed a *particeps criminis*, on account of having paid or having agreed to pay such usurious interest or such inducement, but shall have like remedy and relief in either case" (whether the excess had been paid in advance or not). (Laws 1860, ch. 75, § 3.) The statute of 1863 contained the same provision (Laws 1863, ch. 33, § 3) and in the revision of 1868 it was declared that the debtor should not be deemed "in equal wrong." (Gen. Stat. 1868, ch. 51, § 3.) This declaration remained in the statute until 1872 (Laws 1872, ch. 134, § 2), when it was omitted for the first time. It will hardly be contended that the omission of this legislative declaration in subsequent statutes manifests an intention to alter the public policy or to

change the status of the parties to a contract which is usurious. Moreover, it is clear that there is no force in any argument based upon the doctrine that the parties are in equal wrong, because the only penalties and forfeitures imposed by the statute are for the benefit of the borrower. In *Mason v. McLeod*, 57 Kan. 105, 45 Pac. 76, and in *Nyhart v. Kubach*, 76 Kan. 154, 90 Pac. 796, the purchaser of a patent right sold in violation of the provisions of the statute was permitted to recover the consideration because the statute was passed for the protection of the one who purchases, and he is not in equal wrong; but in *Ridgway v. Wetterhold*, 96 Kan. 736, 153 Pac. 490, it was held that, so far as the seller of the patent right is concerned, the contract is tainted with illegality, and no action can be maintained by him to enforce any part of the contract.

In Webb on Usury, section 460, it is said:

It is observable that the reasoning which relieves the payer of the character of *particeps criminis*, also takes his payment out of the operation of the rule relative to voluntary payments. No payment obtained through oppression or undue advantage is voluntary, and the law presumes every payment made to a person who is by statute forbidden to receive it, where the statute is for the protection of the payer, as made through oppression and undue advantage."

In 6 Ruling Case Law, page 834, it is said:

"The lender is never allowed to take advantage of the statute, because he is the guilty party; the borrower may do so, because he is not a *particeps criminis*. He is regarded as the victim of the usurer, and not *in pari delicto*."

In Tyler on Usury, page 421, it is said:

"A party who has paid excessive interest may, at common law, recover the excess, in an action for money had and received. The law considers the borrower rather as a victim than an aggressor. Statutes are passed prohibiting usury, in order to protect needy and necessitous persons from the oppression of usurers, who are eager to take advantage of the distresses of others, and who violate the law only to complete their ruin. At least, this is the theory on which these enactments are made."

(See, also, 9 Cyc. 553.)

In 39 Cyc., page 1030, it is said:

"The common-law doctrine which has been adopted by many of the American courts is that the debtor may recover payments made upon a loan in excess of the legal rate of interest. According to this doctrine such payments are not deemed voluntary, nor the debtor to be *in pari*

Marshall v. Beeler.

*delicto* in making them. Hence, an action lies to recover such usurious excess from the creditor who ought not in equity and good conscience to retain more than his principal and lawful interest thereon. It is held in these states that other remedies given by statute do not supplant the common-law right, but are cumulative merely."

Some of the American cases in which the courts have refused to allow a party who has paid usurious interest to recover it back by action, on the ground that the payments were voluntary and the debtor *"in pari delicto* with the creditor" are cited in the note in 39 Cyc., page 1032.

A far more difficult question to be determined is, whether our statute of usury, which imposes certain penalties and forfeitures upon the creditor, and gives to the debtor the benefit of them, has abrogated the right which the courts have quite generally denominated the common-law right, to recover the excess in an action for money had and received. In strictness, no such right existed at the common-law until there was some statute which fixed the legal rate of interest, and condemned usury. Upon this question the American courts are hopelessly at variance. The authorities on both sides are cited in a note on the "Right, in the absence of a statutory provision therefor, to maintain an action to recover back usurious payments" (L. R. A. 1918B, 585-595), in which the author states that the conflict

"is due in a considerable degree to differences in the usury statutes relating to the consequences and effects of usury. The tendency is to permit such recovery where the statute declares the contract void in whole or in part, or punishes a violation of its provisions by the infliction of fines, penalties, or forfeitures, upon the person who takes it, but to deny such recovery if the statute merely prevents the recovery of the usurious excess, or of any interest at all, and otherwise attaches no pains or penalties to the reservation or exaction of usury." (p. 585.)

The author further says—

"By the weight of authority, both in this country and in England, an action at common law, in the nature of an action for money had and received, will lie for the recovery back of usurious payments; at least, where the statute in relation to usury declares usurious contracts void in whole or in part." (p. 585.)

"By the weight of authority the common-law remedy of assumpsit to recover back payments of usury is not abrogated by statutes providing other remedies for the recovery of such payments or for the recovery of penalties and forfeitures." (22 Encyc. Pl. and Pr. 482.)

In *Brown v. McIntosh,* 39 N. J. L. 22, it was argued that the statute provided a method of redress for a party who agreed to pay, or who had paid, an excessive rate of interest, and his remedy was to interpose his defense when sued on the notes, and that, by implication, the statute defeats the common-law remedy for money once paid. Commenting upon this contention, the court said:

"It is equally clear that the design of the act is now, as ever, to protect the borrowers. All the reasons for allowing this action still subsist. On common-law principles the remedy still remains, unless taken away by the second section of the act. (*Wheaton v. Hibbard,* 20 Johns. 290.) It does not do this by express words. Nor is there any implication that the action is by legislative intent abolished." (p. 27.)

In a note in 39 Cyc., page 1033, it is said:

"The New York courts have been uncertain whether such statutory remedy was exclusive of that given at common law."

In view of the wide diversity of opinion upon the precise question, it is not worth while to review the authorities without a careful examination of the statutory provisions involved in each case, because that would be necessary in order to determine where the actual weight of authority rests. Besides, it is only by considering the purpose and effect of our own statute that the correct solution of the question can be arrived at. Our earliest statute of usury authorized an action to recover the excessive interest, but only in the particular instance where "any part of that which purports to be the principal . . . has been added by way of usurious interest, and with the intent to evade the provisions of this act." (Laws 1860, ch. 75, § 4.) There was no general provision for recovering back usurious payments, however; the provision applied only where the interest had been added to the principal for the purpose of evading the law. In 1863 (ch. 33) the act was amended and this provision was stricken out. If the provision in the act of 1860 had been a general one authorizing the debtor in all cases to maintain an action to recover back usurious interest paid, there would arise the question as to the effect of the subsequent repeal of the provision. Some of the courts, for instance, have held that the repeal of a statute giving the right to recover the usury paid leaves the common-law right unimpaired (*Harper v. Building Association,* 55 W. Va. 149), and in some states the

Marshall v. Beeler.

courts have gone to the extent of declaring that the right to recover the usurious excess may be prosecuted after the statutory right is barred. (*Porter v. Mount*, 41 Barb. [N. Y.] 561; *Wood v. Lake*, 13 Wis. 84; *Berry v. Makepeace*, 3 Ind. 154.) In 1865, Indiana had a statute prohibiting the recovery of usury voluntarily paid, but in 1879 the act was repealed, and it was held that the repeal revived the common-law rule, as the statute was merely declaratory of the common-law. (*Baum et al. v. Thoms*, 150 Ind. 378.)

We do not attach very much importance to the fact that the statute of 1860 authorized an action to be brought, because, as already observed, the right was expressly limited to a particular situation. The revision of the statute in 1868 authorized the parties to stipulate for interest not exceeding 12 per cent. (Gen. Stat. 1868, ch. 51, § 2.) All payments by way of usurious interest, or of inducement to contract for more than 12 per cent per annum, it was declared, "shall be deemed and taken to be payments made on account of the principal; and the courts shall render judgment for no greater sum than the balance found due after deducting the payments of money or property made as aforesaid, without interest." (Gen. Stat. 1868, ch. 51, § 3.) The act was amended in 1872 and all restrictions as to the rate of interest in a written contract were repealed. The parties were permitted to contract in writing for interest at any rate they saw fit, "provided, that no person shall recover in any court more than twelve per cent interest thereon per annum." (Laws 1872, ch. 134, § 1; *Day v. Walker*, 16 Kan. 326, 330.)

The statute as it now reads was enacted in 1889, with the provision that any person contracting for a greater rate of interest than 10 per cent shall forfeit all interest so contracted for in excess of such rate, and in addition thereto shall forfeit a sum of money equal to the excessive rate. This was the first time the statute provided for forfeiting double the amount of the excessive interest. The statute also contains a provision that a *bona fide* endorsee of negotiable paper purchased before due shall not be affected by any usury exacted by any former holder, unless he shall have actual notice of the usury previous to his purchase, with the further provision that double the amount of such excess incorporated into negotiable paper

"may in such cases, after payment, be recovered back by action against the party originally exacting the usury," but such action is required to be brought within ninety days from the maturity of such paper. (Gen. Stat. 1915, § 5483.)

It must be obvious that as the law stood in 1872, no common-law right to maintain an action to recover excessive interest existed in this state (*Day v. Walker*, supra), because there was nothing declaring it unlawful for the parties to contract in writing for the payment of any rate of interest. There was merely the prohibition against courts lending their aid to enforce the contract for more than 12 per cent interest per annum.

No cause of action is expressly given under the present statute to recover back from the original payee usurious interest; the borrower is given the right to set up the defense in an action on the instrument, in which case double the amount of the excess interest is to be deducted from the amount lawfully due. The fact that the legislature was careful to provide a cause of action against the original payee where the payments have been made to a *bona fide* indorsee, indicates, we think, an intention to leave the borrower to the sole remedy of refusing to pay, and when sued upon the instrument, the right of setting up the defense of usury. The statute, we think, must be construed as intended to cover the whole subject of interest and usury, and to define the rights of the parties. It imposes a penalty upon the lender by forfeiting double the amount of the excess charge contracted for, if the borrower see fit to plead the defense; it permits the latter, however, to pay the interest rate, if he is willing, but makes no provision for a direct action to recover back payments made, except in the one case where the borrower has been compelled to pay usurious interest to an innocent holder of the paper, and has been deprived of the right to set up the defense. By these provisions the statute recognizes that the parties are not *in pari delicto;* but, notwithstanding this, the manifest purpose of the legislature must have been to abrogate the common-law remedy. In one respect, at least, the statutory remedy is broader than the common-law remedy. The statutory remedy permits the debtor to plead the usury and recover by a set-off double the amount of such excess. In those jurisdictions

where the common-law doctrine has been adopted, the amount
of the recovery is necessarily limited to the excess over the law-
ful interest (10 Cyc. 1033), which is all that is recoverable, and
is all the plaintiff in this case seeks to recover.

We have already referred to the fact that much learning has
been expended by the courts in determining whether the
parties to a usurious contract are in equal wrong; and the fact
that they are not in equal wrong has been used mostly for the
purpose of furnishing a basis for declaring that usurious pay-
ments made were not voluntary. In our opinion, this by no
means follows. Our statute undoubtedly recognizes that the
parties are not *in pari delicto,* because the statute was en-
acted for the protection of the debtor; but the statute does
recognize that the debtor may voluntarily pay the excessive
interest, refuse to plead usury as a defense, and the transac-
tion shall not be void. The contract for the excessive interest
is made voidable at the election of the debtor, until he has vol-
untarily paid it. When the statute was enacted it was ob-
viously designed to cover the entire subject of usury, including
the penalties to be imposed upon the creditor for exacting it,
as well as the remedies by which the debtor may protect him-
self from the creditor's oppression and obtain the benefits of
the forfeitures and penalties imposed solely for his own ben-
efit.

"The common law is impliedly repealed by a statute which is incon-
sistent therewith, or which undertakes to revise and cover the whole sub-
ject-matter." (8 Cyc. 376.)

The contrary rule obtains if there is no repugnancy between
the common-law and the statute, and it does not appear that
the legislature intended to cover the whole subject. (*Court-
ney v. Staudenmayer,* 56 Kan. 392, 43 Pac. 758.)

There is another reason why this construction should be
placed upon the provisions of our statute. In the present case
the $2,500 bonus undoubtedly comes within the definition of
an involuntary payment. It was exacted because of the op-
pression of the creditor, and the plaintiff's necessities required
him to pay this sum in order to obtain an extension of the loan;
but when the last payment upon the indebtedness became due,
the plaintiff could have withheld that sum from the stipulated
amount, if he had desired. He paid it without any compul-

sion. The debt had matured; payment gave him no further extension. The only possible inconvenience he could have suffered by refusing payment then, was of defending an action brought by the creditor to recover the excess, and to such an action the statute gave him a perfect defense. Moreover, after paying all that was justly due, he could have maintained a suit to enjoin the collection of the usurious interest. (*Waite v. Ballou,* 19 Kan. 601.) Payment, therefore, at a time when he was under no possible compulsion, can only be regarded as a voluntary one. As said in the opinion in *Kelly v. Miami County,* 85 Kan. 38, 46, 116 Pac. 477:

"'The law does not give him the right to pay a demand for which he knows he is not legally liable and then give him a right of action to recover his payment back.' (63 Kan. 343.)"

For two reasons the plaintiff cannot maintain the action—the provisions of the statute have abrogated any common-law right that may be said to have existed authorizing such an action, and besides, he cannot recover the excessive interest, because its payment was wholly voluntary.

The judgment is reversed, and the cause is remanded with directions to render judgment in defendant's favor for costs.